1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH ALLDREDGE,<br><br>        Petitioner,<br><br>   v.<br><br>KELLY HARRINGTON,<br><br>        Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. C 06-7147 MMC (PR)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS; DENYING
CERTIFICATE OF APPEALABILITY;
DIRECTIONS TO CLERK**

Before the Court is the above-titled petition for a writ of habeas corpus, filed by

petitioner Joseph Alldredge pursuant to 28 U.S.C. § 2254, challenging the validity of a

judgment obtained against him in state court.[1]  Respondent has filed an answer to the

petition, and petitioner has filed a traverse.

## I.  PROCEDURAL HISTORY

In 2000, a San Mateo County jury found petitioner guilty of two counts of stalking.

(People v. Alldredge, No A091638 (Cal. Ct. App. Dec. 27, 2002) (hereinafter "Ex. 5 ") at 1).[2]

---

[1]Respondent correctly notes that petitioner should have named as respondent the
immediate custodian of petitioner's place of incarceration, which is Kern Valley State Prison
("KVSP").  Accordingly, the Clerk is hereby DIRECTED to substitute as respondent, in lieu
of Arnold Schwarzenegger, the current Warden of KVSP, Kelly Harrington.  See Fed. R.
Civ. P. 25(d).

[2]All references herein to exhibits are to exhibits submitted by respondent.

1    The jury also found true allegations of two prior strike convictions and a prior prison term.

2    (Id.)  Petitioner was sentenced to a term of 26 years to life in prison.  (Ex. 1 at 660-63.)

3            On April 6, 2005, the California Court of Appeal reversed the conviction on one count

4    of stalking, and affirmed the judgment in all other respects. (Ex. 5.)  The California Supreme

5    Court thereafter summarily denied the petition for review. (Ex. 7.)  Petitioner filed several

6    habeas petitions in state court, each of which was unsuccessful.

7            On October 4, 2006, petitioner filed the instant petition in the Southern District of

8    California.  The case was transferred to the Northern District on October 31, 2006.  On

9    January 11, 2007, the petition was dismissed with leave to amend, and on February 16, 2007,

10   petitioner filed an amended petition.

11

12                              **II.  STATEMENT OF FACTS**

13           The California Court of Appeal found the facts underlying petitioner's conviction to

14   be as follows:

15           Lynda Rose Nardone-Dabrowski testified that she and [petitioner] had lived
             together from 1983 to 1988.  At the time she had two daughters from a
16           previous marriage, Allison and Michelle.  Thereafter, she and [petitioner] had
             two more children: Paul, born in 1985, and Angelica, born in 1987.  Initially,
17           they lived in La Jolla.  While they were living in La Jolla, [petitioner] told Ms.
             Dabrowski that he had once abducted a child from a previous marriage and
18           taken her to Baja California.

19           Ms. Dabrowski testified that [petitioner] was physically and mentally abusive
             to her during their relationship.  He often hit her, causing bruising.  He once
20           broke some of her ribs, which punctured her lungs and caused her to be
             hospitalized.  A couple of times, Ms. Dabrowski reported him to the police.
21           Once, in San Diego, he was arrested after he locked himself in the house with
             the children.
22
             In 1987, the family moved to Santa Cruz to advance Ms. Dabrowski's career as
23           a registered nurse.  [Petitioner] worked at home for himself, selling computer
             parts and refurbishing computers.  In December 1988, Ms. Dabrowski became
24           aware that [petitioner] had molested her 8-year-old daughter Allison.  She
             immediately called the police and ended her relationship with [petitioner].
25
             [Petitioner] was convicted and imprisoned for the molestations in 1989 and was
26           released on parole in April 1995.  Ms. Dabrowski had sole legal custody of all
             four children.  In January 1989, she obtained a three-year restraining order
27           against [petitioner], forbidding him to have any contact with her or the four
             children.
28

United States District Court
For the Northern District of California

2

United States District Court
For the Northern District of California

Ms. Dabrowski married Ed Dabrowski in December 1994, and they settled in Foster City.  They kept their phone number unlisted to avoid any contact with [petitioner].  Both worked for a Daly City home health care company.

* * *

On July 10, 1995, [petitioner] telephoned Ms. Dabrowski at work and claimed to need home health care for his mother, whom Ms. Dabrowski knew had died in 1985.  Recognizing that the caller was [petitioner], Ms. Dabrowski summoned her husband and put the call on speakerphone.  Before she did this, [petitioner] identified himself and said he had not done so earlier because he knew that Ms. Dabrowski would not speak to him.  Mr. Dabrowski described his wife as afraid, panicky, and angry when she summoned him.

With both Mr. and Ms. Dabrowski listening, [petitioner] said he wanted his mother's jewelry, and he wanted to know whether his children were alive, and if so, where they were.  [Petitioner] said he had been told the children had died in a house fire.  Ms. Dabrowski assured him the children were alive, but she did not tell him where they were.  Ms. Dabrowski told [petitioner] she was going to inform his parole officer about this contact.  She did so, and [petitioner] was arrested two days later for violating his parole; a condition of his parole was that he not contact Ms. Dabrowski.

When the Dabrowskis arrived home about 6 p.m. on July 10, [petitioner] telephoned.  Ms. Dabrowski answered the phone and hung up when she heard [petitioner's] belligerent voice.  [Petitioner] called again, and Mr. Dabrowski answered.  Mr. Dabrowski told [petitioner] to stop contacting them and that he was going to inform his parole officer.  The Dabrowskis unplugged their telephone and went to the police station to report the two phone calls.

Ms. Dabrowski felt harassed by the phone calls and feared for herself and her family because she did not know where [petitioner] was when the calls were made.  She said the children could not sleep on the night of the telephone calls.  At that time she had been leaving the two older children home during the day, watching the two younger ones, when they did not have day camp.  After the phone calls, she arranged more adult supervision for the children.

In August 1995, Ms. Dabrowski began to receive mail from [petitioner].  She obtained another restraining order against [petitioner].  Ms. Dabrowski described the mail as "unwarranted, it was unwanted.  From my perspective it was harassment, it was unnecessary to do so . . . .  I wanted nothing to do with this man."  Ms. Dabrowski testified that she feared for her family what [petitioner] might do: "It's unpredictable behavior, we had no sense of feeling that we could relax, that the children were not going to be in danger or abducted."

In the first letter, postmarked January 16, 1996, and sent to Ms. Dabrowski's office, [petitioner] told her she would always be his friend and reminded her that on December 31, 1988, or the morning of January 1, 1989, he had told her she could fly out and join him and Paul and Angelica anywhere in the world for as long as she wanted.  Since [petitioner] had told her before that he used to live in Europe, Ms. Dabrowski testified that she felt he was "capable" of going abroad, a thought that caused her to worry he would abduct the children.

[Petitioner] sent two more letters to Ms. Dabrowski's office around the same

time from Centinela State Prison.  One letter said he had thought his children had been killed in a house fire until his contact with her in 1995.  Ms. Dabrowski said she felt "accused and taken aback that this fire incident shows up this way."  A reference to Switzerland in one of the letters made her fear "a plan of action, potential abduction to take the children with him or away from us seemed to be a fairly strong pattern in this."

A letter of November 23, 1995, from prison was also sent in violation of the restraining order.  [Petitioner] again mentioned his belief that the children had been killed in the fire.  Ms. Dabrowski testified that she had never told [petitioner] such a thing.

Many more letters by [petitioner] to Ms. Dabrowski were introduced into evidence, which had been turned over to the police unopened.  Ms. Dabrowski testified that her state of mind regarding these letters was that it was an intrusion into her work environment, that it resurrected the fear she used to have when she lived with [petitioner], and that she was offended by it.  When asked if receiving the letters affected her perception of what would happen if [petitioner] had contact with his kids, she stated: "I don't trust him, Mr. Lynch.  I don't trust his motives, his ability to care, father them, his ability to protect or insure their health, their mental well-being, any of that."  Ms. Dabrowski testified that she never showed any of the letters to her children, nor did she talk about the situation with [petitioner] with them or around them.  She did, however, warn them not to talk to strangers.  The children were affected by their parents' stress and had some disturbances in sleep patterns.  Even the letters that she did not open still distressed Ms. Dabrowski.

Ms. Dabrowski said the effect of all of these letters was that they were "intrusive."  They reminded her of all the reasons why she had left [petitioner].  She stated: "I think we have all feared for our own safety individually in this family as well as parents to protect children."  Her children had become fearful as well.  The family moved out of the Bay Area in part because of [petitioner's] conduct.

As to the letters she had originally read, Ms. Dabrowski said the overall theme was control, manipulation, and disrespect: "[T]he letters continue to disrespect me as a human being, causing fear, causing anger."  She is frightened of what [petitioner] might do to the children and equally as nervous for herself.

* * *

**Defense**

[Petitioner] testified in his own defense.  He admitted calling Ms. Dabrowski from his boat located in San Diego.  He said that when he was on trial in Santa Cruz a prosecutor told him that his children died in the fire that burned Ms. Dabrowski's house.  He called to find out where his children were buried, and he said Ms. Dabrowski confirmed they were dead.  [Petitioner] said he discovered afterward that his children were alive, and that he tried to contact them to tell them he loved them.  [Petitioner] said he and Ms. Dabrowski had four children, two of whom were dead.

[Petitioner] claimed Ms. Dabrowski had murdered his mother and had stolen her jewelry.  He also claimed Ms. Dabrowski tried to stab him, that she kidnapped his children, and that she told him she murdered three men in

Maryland.  [Petitioner] admitted that in one of the letters he wrote to Ms. Dabrowski he cited the Penal Code section on stalking and accused her of stalking him.  He denied ever being ordered by a court to refrain from contacting his children, but he also denied trying to contact his son or daughter. [Petitioner] claimed to have "physical legal custody" of Paul and Angelica. [Petitioner] claimed to have more than 19 children and claimed his grandfather had established a trust fund for his sons to attend school in Switzerland. [Petitioner] unsuccessfully ran for Congress in 1980.

(Ex. 5 at 2-6 (footnote omitted).)

## III.  DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Further, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict."  Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  A federal habeas court, however, "may not issue the writ simply

1   because that court concludes in its independent judgment that the relevant state-court

2   decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

3   "Rather, that application must also be unreasonable." Id.

4        As applicable to both the "contrary to" and "unreasonable application " clauses,

5   "clearly established federal law, as determined by the Supreme Court of the United States"

6   refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the

7   time of the relevant state-court decision." Id. at 412.  "A federal court may not overrule a

8   state court for simply holding a view different from its own, when the precedent from [the

9   Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

10       Here, the California Court of Appeal, in its opinion on direct review (Ex. 5), did not

11  address the claims petitioner raises by the instant petition, and both the California Court of

12  Appeal and the California Supreme Court summarily rejected said claims on their merits.[3]

13  The San Mateo Superior Court, however, addressed one of petitioner's instant claims.  (See

14  Amended Pet. at 15-17 (Order of Denial).)[4]  Consequently, as to that claim, the San Mateo

15  Superior Court was the highest court to have done so in a reasoned decision, and, as to that

16  claim, it is the Superior Court's decision that this Court reviews herein.  See Ylst v.

17  Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th

18  Cir. 2005).  As to the claims for which there is no reasoned opinion available, the United

19  States Supreme Court has recently clarified that a federal habeas court, in applying the

20  review provisions of 28 U.S.C. § 2254(d), looks to the result reached by the highest state

21  court, and that the absence of reasoning does not prevent application of the standard of

22  review set forth in § 2254(d).  See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

23  B.   Petitioner's Claims

24       Petitioner claims that: (1) the trial court violated his Sixth Amendment right to

25

26       [3]See California Appellate Courts' on-line Register of Actions at
    http://appellatecases.courtinfo.ca.gov/index.html.

27

28       [4]As referenced herein, the pages of the Amended Petition have been assigned numbers
    sequentially beginning with the title page.

represent himself at trial; (2) the trial court violated his Sixth Amendment right to a speedy trial; (3) the trial was held in an improper venue, in violation of his Sixth Amendment rights; and (4) his sentence violated his rights under Apprendi v. New Jersey, 530 U.S. 466, 488-90 (2000).  The Court addresses each such claim in turn.

1.    Self-Representation

Petitioner claims the trial court unconstitutionally deprived him of his right to represent himself at trial.

a.    Background

Petitioner represented himself until July 24, 1998, at which time his pro se status was revoked by the trial court during his second preliminary hearing.  (Ex. 8 at 189-90.)  Prior to so ruling, the trial court had terminated petitioner's cross-examination of the victim due to his irrelevant, repetitive, and harassing questioning, as well as his continuing refusal to comply with court orders.  (Id. at 51-167.)  The following day, petitioner feigned illness and refused to leave his jail cell to return to court (id. at 168-69), after which the judge ordered petitioner physically brought to court and also ordered a medical examination.  (Id.)  The examining doctor determined petitioner was not ill.  (Id.)  Thereafter, when petitioner refused to answer the court's questions or otherwise speak (id.), the court found petitioner was "faking this in order to manipulate the court and obtain a continuance, and delay of [the] proceedings" (id. at 170).  The court then appointed as counsel for petitioner the attorney who previously had acted as his advisory counsel.  (Id. at 169-70, 190.)

On February 16, 2000, before a different judge and less than two weeks before trial, petitioner renewed his motion to represent himself.  (Ex. 27 at 638-51.)  After hearing argument, the trial court denied the motion, finding petitioner had "chronically interrupted court proceedings," "engaged in outbursts" against the prosecutor and against the court, manipulated court-appointed doctors, and attempted to intimidate jurors at his competency trial, which had been held earlier in the case.  (Id. at 645-47.)  The trial judge also quoted the transcript of the court's remarks at the July 24, 1998 preliminary hearing, noting "[those] observations are consistent with what I've observed."  (Id. at 649-50.)

1

b.      Superior Court Opinion Addressing Petitioner's Claim

2      On state habeas, the San Mateo Superior Court rejected this claim in a reasoned

3  decision, explaining that petitioner had "failed to establish that at the time he made the

4  motions [to represent himself], he understood the dangers of self-representation, and was able

5  to knowingly and intelligently waive his right to counsel." (Amended Pet. at 17.)  In so

6  ruling, the state court relied on People v. Welch, 20 Cal. 4th 701, 729 (1999), which

7  incorporated the requirements for self-representation set out by the United States Supreme

8  Court in Faretta v. California, 422 U.S. 806, 835 (1975).  The state court also found

9  petitioner's motions were properly denied on the basis of his "disruptive behavior . . . in the

10  courtroom and in related proceedings. (Amended Pet. at 17.)

11

c.      Analysis

12      A criminal defendant has a Sixth Amendment right to self-representation.  See Faretta

13  v. California, 422 U.S. 806, 819-20 (1975).  Such right exists despite the fact that, in most

14  cases, a defendant would be better served by counsel.  Id. at 834.  A defendant's decision to

15  represent himself and waive the right to counsel, however, must be unequivocal, knowing

16  and intelligent, timely, and not for purposes of securing delay.  Faretta. 422 U.S. at 835;

17  United States v. Arlt, 41 F.3d 516, 519 (9th Cir. 1994); Adams v. Carroll, 875 F.2d 1441,

18  1444 & n.3 (9th Cir. 1989).  Additionally, the defendant must be competent to waive counsel.

19  Godinez v. Moran, 509 U.S. 389, 396 (1993).  While a trial judge may doubt the quality of

20  representation that a defendant may provide for himself, the defendant must be allowed to

21  exercise his right to self-representation so long as he knowingly and intelligently waives his

22  right to counsel and is "able and willing to abide by rules of procedure and courtroom

23  protocol."  See McKaskle v. Wiggins, 465 U.S. 168, 173 (1984).  A judge "may terminate

24  self-representation by a defendant who deliberately engages in serious and obstructionist

25  misconduct."  Faretta, 422 U.S. at 834 n.46.

26      Here, the record amply supports the state court's finding that petitioner had displayed

27  disruptive behavior of sufficient seriousness to justify denial of self-representation.  During

28  petitioner's cross-examination of the victim at the July 1998 preliminary hearing, for

United States District Court
For the Northern District of California

example, petitioner continued to ask, despite the court's admonition, irrelevant questions, such as the victim's name, birth date, social security number, "real" parents, marital history, and prior residence.  (Ex. 8 at 51-56, 99-103.)  The court later admonished petitioner for forcing the victim to sit and wait while petitioner read various items into the record, thumbed through materials, and rambled.  (Id. at 64.)  Petitioner addressed the victim as "Lynda" or "Nardo" despite the court's order that she be referred to as "Mrs. Dabrowski."  (Id. at 66, 75, 101, 165.)  The court also noted several lines of questioning that had no apparent purpose other than to harass the victim.  (Id. at 105, 123-24.)  On multiple occasions, the court warned petitioner to follow its instructions, examples of which include the following:

> – I have an interest to not only protect your rights in these proceedings, [but] also protect the interest of those who come before us, such as this witness.  And I am not going to sit here and allow her to be badgered or beat up by areas of inquiry that don't have anything to do with the matters that are before the court today.  (Id. at 107.)

> – You don't want to follow any direction, and somewhere along the lines you and I are going to lock horns on that point.  (Id. at 110.)

> – Mr. Alldredge, you are not going to ask questions regarding these matters. All your [sic] trying to do is hurt this woman by making these questions.  (Id. at 124.)

> – Why waste the court's time producing a letter in your defense which only supports and dramatizes the degree [to] which she feels she was terrorized?  I mean, what is your purpose here?  Is your purpose simply to beat up on this lady in court?  . . . To try and get even for some past misdeed you feel that she's guilty of?  (Id. at 134.)

> – Is there anything else?  I am not going to continue to allow you to badger and harass her?  (Id. at 161.)

As noted above, petitioner feigned illness the following day and refused to answer the court's questions or otherwise speak, leading the court to revoke petitioner's pro se status. (Id. at 168-69, 190.)  Petitioner's misconduct continued up to and beyond the time he renewed his Faretta motion in February 2000.  Examples of petitioner's disruptive and obstructionistic conduct include the following:

> – On August 19, 1999, the court ordered petitioner removed from the courtroom after petitioner ignored the court's request to not speak.  The court stated, "We don't have time for Mr. Alldredge's shenanigans this morning." (Ex. 9 at 3-4.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– On October 4, 1999, petitioner was noted to be on suicide watch in the county jail. (Ex. 10 at 1.)

– On October 19, 1999, the day the case was set for trial, petitioner entered a plea of not guilty by reason of insanity. (Ex. 1 at 38; Ex. 13 at 48-49.) He later withdrew the plea on October 28, 1999. (Ex. 14 at 90.) Subsequently, on February 8, 2000, following a verdict of competency, petitioner stated he wanted to reenter his plea of not guilty by reason of insanity, explaining "I am going to change the plea so I can get out of your courtroom, get out of this concentration camp . . . . Give me a life sentence and get me the hell out of here so I can go to Atascadero [Mental Hospital]." (Ex. 26 at 7-8.)

– On November 8, 1999, after petitioner again attempted to withdraw his plea and withdraw a time waiver, the trial court made a finding that petitioner was obstructing the judicial process. (Ex. 15 at 113.) The court also ordered petitioner to follow the rules and not interrupt the court, defense counsel, or the prosecutor. (Id.)

– On December 22, 1999, the court found petitioner in contempt for not complying with court rules. (Ex. 18 at 219-21.) Petitioner addressed the judge solely by his last name, saying "Play all the games you want, Forcum." (Id. at 220.)

– On February 1, 2000, during his competency trial, petitioner responded in an evasive manner to questions posed on cross-examination, informing the prosecutor at one point that it was "Super Tuesday back east where they will vote in the primary for Al Gore, Bradley, or my friend . . . ." (Ex. 21 at 30.) He later informed the prosecutor "I will accept a hostile witness classification pursuant to the U.S. Constitution. This is not Nazi Germany. I am not an American PO. I will answer on the First Amendment use my speech, use my legion [sic] and use my press any way I like. If you don't like it, stuff [sic]." (Id. at 31.)

– On February1, 2000, also during his competency trial, petitioner admitted that he had attempted to manipulate a court-appointed doctor. (Ex. 22 at 266.)

– On May 9, 2000, the court repeatedly directed petitioner to be quiet, and the court had to call a recess after petitioner interrupted proceedings by stating before the jury "Forcum, I've got to get out of here." (Ex. 49 at 467, 478, 489.) The court later informed petitioner that his usual "5 minutes time a day" to address the court directly, rather than through counsel, was revoked due to his continuing outbursts. (Id. at 535.)

– On May 10, 2000, petitioner interrupted the victim's trial testimony stating, "She came at me with a 14-inch butcher knife." (Ex. 50 at 615.) The court cautioned petitioner about his outbursts and had petitioner removed from the courtroom. (Id. at 616-18.)

In sum, petitioner was either unable or unwilling to "abide by rules of procedure and courtroom protocol." See McKaskle, 465 U.S. at 173. Petitioner's behavior at the preliminary hearing and subsequent proceedings left the trial judge with no real alternative but to appoint counsel for petitioner if he wanted to maintain orderly courtroom proceedings

at trial and to protect the other participants therein from harassment.

Lastly, as noted by the Superior Court on state habeas, petitioner nowhere establishes that he fully and intelligently understood the risks of self-representation at the time he made his <u>Faretta</u> motion.  <u>Godinez</u>, 509 U.S. at 400; <u>Faretta</u>, 422 U.S. at 835.  Moreover, as noted above, petitioner pled not guilty by reason of insanity, and proceedings were suspended to determine petitioner's competence to stand trial.  Defense counsel communicated to the trial court that petitioner likely did not understand the charges against him.  (Ex. 16 at 125.) Under such circumstances the trial court was not unreasonable in determining petitioner lacked the capacity to conduct his own defense at trial.  <u>See</u> <u>United States v. Ferguson</u>, 560 F.3d 1060, 1068 (9th Cir. 2009) (holding defendant may be incompetent to represent himself although found competent to stand trial); <u>see also</u> <u>Indiana v.Edwards</u>, 554 U.S. 164, 176-78 (2008) ("[T]he Constitution permits states to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.")

For the reasons set forth above, the Court finds the state court's adjudication of the instant claim was neither contrary to nor an unreasonable application of clearly established federal law, and, accordingly, petitioner is not entitled to habeas relief based thereon.

    2.    <u>Speedy Trial</u>

Petitioner's road from arrest to conviction took many detours.  Those detours form the basis of his Sixth Amendment speedy trial claim.  The Court has assembled the following timeline as background for this claim:

| | |
|---|---|
| July 13, 1995 | Petitioner arrested for parole violation.  (Ex. 53 at 2.) |
| July 25, 1996 | Complaint filed in San Mateo County Superior Court (Case No. SF-279298A), charging petitioner with one felony count of stalking. (Ex. 54 at 2.) |
| August 15, 1996 | Petitioner arrested on stalking charge.  (Ex. 53 at 2; Ex. 54 at 2.) |

| | |
|---|---|
| August 21, 1996 – December 19, 1996 | Various hearings held on stalking charge.  (Ex. 54 at 2-3.)[5] |
| December 19, 1996 | State court suspends proceedings to assess petitioner's mental competence under Cal. Penal Code §§ 1367 and 1368.  (Ex. 54 at 3; Ex. 55.) |
| May 6, 1997 | State court commits petitioner to state mental health system, following examinations by two psychiatrists, Drs. Fricke and De Sagun.  (Ex. 55.)[6] |
| June 5, 1998 | State court finds petitioner competent to stand trial and orders him returned to court.  (Exs. 55.)[7] |
| July 23, 1998 | Preliminary examination on stalking charge re-commences.  (Ex. 8 at 2; Ex. 54 at 3.) |
| July 24, 1998 | Petitioner held to answer.  (Ex. 8 at 211; Ex. 54 at 3.) |
| August 5, 1998 | San Mateo District Attorney files information (Case No. SC-43295A).  (Ex. 57.) |
| September 15, 1998 | State court again suspends proceedings to assess petitioner's mental competence under Cal. Penal Code §§ 1367 and 1368.  (Ex. 57.) |
| May 24, 1999 | State court finds petitioner competent and re-instates criminal proceedings.  (Ex. 57.)[8] |
| July 26, 1999 | Jury trial set to commence, but court grants prosecution's motion to dismiss case due to witness unavailability.  (Ex. 57.) |
| July 27, 1999 | San Mateo District Attorney files new complaint re-charging petitioner with stalking.  (Case No. SF-301096A).  (Ex. 58 at 1-2.) |

---

[5]A total of ten hearings were held during this four-month time period.  The first hearing, on August 21, 1996, was for the purpose of having petitioner delivered to the San Mateo County Sheriff from RJ Donovan State Prison, where petitioner was serving a term for his parole violation.  (Ex. 53 at 2; Ex. 54 at 2.)  The criminal docket reflects six hearings in the period from September 4, 1996  to December 19, 1996, each identified as "preliminary hearing," although testimony commenced on December 16, 1996 and continued on December 19, 1996.  (Ex. 54 at 2-3, 8.)   Of the remaining three hearings, all of which predate the December 16 proceedings, one was held on a "motion to quash," and the other two are identified only as "further proceedings."  (Ex. 54 at 2-3.)

[6]The defense and prosecution stipulated that the doctors' reports be admitted into evidence and that the court make a finding as to competence based on the reports.  (Ex. 55.)

[7]The competency issue was again submitted to the court on the basis of doctors' reports, in this instance from psychiatrists at Patton State Hospital.  (Ex. 55.)

[8]As in the prior competency proceedings, the competency issue was submitted to the court on the basis of reports of two psychiatrists, in this instance Drs. Fricke and Weiner.  (Ex. 57.)

| | |
|---|---|
| August 9, 1999 | Preliminary hearing conducted; petitioner held to answer. (Ex. 1 at 1; Ex. 58 at 2.) |
| August 17, 1999 | San Mateo District Attorney files information charging petitioner with two felony counts of stalking and one felony count of conspiracy (Case No. SC-45687A). (Ex. 1 at 2.) |
| October 19, 1999 | Jury trial set to commence, but petitioner enters plea of not guilty by reason of insanity, and court continues case to November 15, 1999 for receipt of doctors' reports under Cal. Penal Code § 1027(a). Petitioner waives time until November 15, 1999. (Ex. 1 at 38-39; Ex. 13 at 62-77.) |
| November 15, 1999 | Upon motion by defense counsel, court again suspends criminal proceedings to assess petitioner's mental competence under Cal. Penal Code §§ 1367 and 1368. (Ex. 1 at 46; Ex. 16 at 125-26.) Petitioner states he wishes to withdraw his plea of not guilty by reason of insanity. (Ex. 1 at 44; Ex. 16 at 124.) |
| January 31, 2000 | Competency trial commences. (Ex. 1 at 78.) |
| February 3, 2000 | Competency trial concludes with jury finding of competence, and criminal proceedings re-instated. (Ex. 1 at 101.) |
| February 28, 2000 | Jury trial commences on stalking charges. (Ex. 1 at 102, 166.) |
| February 29, 2000 | Petitioner re-enters plea of not guilty by reason of insanity. (Ex. 1 at 212.) |
| March 8, 2000 | Jury returns guilty verdict. (Ex. 1 at 235-39.) |
| March 9, 2000 | Jury trial in sanity phase commences. (Ex. 1 at 253.) |
| March 15, 2000 | Court declares mistrial in sanity phase due to jury deadlock. (Ex. 1 at 262.) |
| May 1, 2000 | Re-trial in sanity phase commences. (Ex. 1 at 456.) |
| May 11, 2000 | Jury finds petitioner sane at time of offense. (Ex. 1 at 489.) |
| June 8, 2000 | Petitioner sentenced to 26 years to life. (Ex. 1 at 660-63.) |

Petitioner claims the trial court violated his Sixth Amendment right to a speedy trial because his trial, which began on February 28, 2000, took place almost five years after his arrest in July 1995.[9]

A speedy trial is a fundamental right guaranteed the accused by the Sixth Amendment to the Constitution and imposed on the states by the Due Process Clause of the Fourteenth

---

[9]It appears petitioner remained in custody continuously throughout that period. (See Exs. 1, 54, 57, 58.)

13

1    Amendment.  Klopfer v. North Carolina, 386 U.S. 213, 222-23 (1967).  "[T]he protection of

2    the Amendment is activated only when a prosecution has begun and extends only to those

3    persons who have been 'accused' in the course of that prosecution."  United States v. Marion,

4    404 U.S. 307, 313 (1971).

5         Here, respondent argues, the speedy trial clock did not begin to run until August 17,

6    1999, the date of the filing of the information upon which petitioner ultimately was

7    convicted.  (Answer at 10-11.)  The Court disagrees.  As the Supreme Court has recognized,

8    "it is either formal indictment or information or else the actual restraints imposed by arrest

9    and holding to answer a criminal charge that engage the particular protections of the speedy

10   trial provision of the Sixth Amendment."  Id. at 320. (emphasis added).  Because petitioner

11   was arrested and held to answer prior to the filing of the above-referenced information,

12   petitioner's speedy trial rights, as discussed below, attached earlier than August 17, 1999.

13   Petitioner, however, is incorrect in contending his speedy trial rights were triggered by his

14   July 13, 1995 arrest.  Petitioner was arrested on July 13, 1995 for violating the conditions of

15   his parole, not for the stalking charges that gave rise to the convictions at issue here.  (Ex.

16   53.)  As noted, federal speedy trial rights are engaged by, inter alia, "arrest and holding to

17   answer a criminal charge."  Marion, 404 U.S. at 320 (emphasis added).  Because petitioner's

18   July 13, 1995 arrest was based on a separate matter, his July 13 arrest cannot serve to start

19   the running of the speedy trial clock on the criminal charges at issue here.  See id.; see also

20   Morrissey v. Brewer, 408 U.S. 471, 480 (1972) (holding "revocation of parole is not part of a

21   criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding

22   does not apply to parole revocation.").  The Court thus turns to the remainder of the timeline.

23        As set forth therein, petitioner was first charged with the stalking here at issue by

24   complaint filed July 25, 1996 in the San Mateo County Superior Court (Case No. SF-

25   279298A), and petitioner was arrested on that charge on August 15, 1996.  (Ex. 54.)  Due to

26   petitioner's commitment to the state mental health system, however, his preliminary hearing

27   was delayed until July 23, 1998, and petitioner was not held to answer until July 24, 1998.

28   (Exs. 8 at 2, 211; Ex. 54.)  Accordingly, under Marion, petitioner's speedy trial rights

14

1  attached on July 24, 1998.  See People v. DePriest, 42 Cal. 4th 1, 26-27 (2007) (applying

2  Marion and holding filing of felony complaint not sufficient to trigger federal speedy trial

3  protection on charged crimes; further holding Sixth Amendment right does not attach until

4  defendant held to answer following preliminary hearing).[10]  The period elapsing between

5  July 24, 1998, when petitioner's speedy trial rights attached, and February 28, 2000, when

6  petitioner's jury trial commenced, was 585 days, i.e., 1 year, 7 months, and 5 days.[11]

7      Claims alleging speedy trial violations are analyzed under the four-factor balancing

8  test set forth in Barker v. Wingo, 407 U.S. 514, 530 (1972).  See Doggett v. United States,

9  505 U.S. 647, 651 (1992).  The four Barker factors are: (1) the length of delay; (2) the reason

10  for delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the

11  defendant.  Doggett, 505 U.S. at 651.  No one factor is "necessary or sufficient" for purposes

12  of a finding of a speedy trial violation.  Barker, 407 U.S. at 533.  Instead, the four "related

13  factors [ ] must be considered together with such other circumstances as may be relevant."

14  Moore v. Arizona, 414 U.S. 25, 26 (1973).

15      The first factor, length of delay, is to some extent a triggering mechanism.  "Until

16  there is some delay which is presumptively prejudicial, there is no necessity for inquiry into

17

18

19      [10]In California, an information is an accusatory pleading charging a felony, subscribed by the district attorney, and filed in the superior court.  Cal. Penal Code §§ 691(c), 739, 949.

20  Before an information may be filed, "there must be a preliminary examination of the case against the defendant and an order holding him to answer."  Id. § 738.  A preliminary examination, commonly called a preliminary hearing, is a public hearing conducted before a

21  magistrate, at which the prosecution and the defendant may present evidence.  Id. §§ 865, 866, 868.  After the preliminary examination, the magistrate will order the defendant "held to

22  answer" on the charge or charges stated in the complaint if "it appears from the examination that a public offense has been committed, and there is sufficient cause to believe that the

23  defendant is guilty."  Id. § 872(a).

24      [11]There is an ambiguity in Marion as to whether an arrest, without more, is enough to trigger the speedy trial clock.  Even assuming petitioner's speedy trial rights attached at the

25  time of his August 15, 1996 arrest, however, the vast majority of the time between the date of that arrest and the date petitioner was held to answer would be excluded from the speedy trial

26  calculation because, as discussed below, the period during which a defendant is incompetent pauses the speedy trial clock.  See United States ex rel. Little v. Twomey, 477 F.2d 767, 770

27  (7th Cir. 1973).  Accordingly, even if the Court were to use the August 15, 1996 arrest as the date on which petitioner's speedy trial rights attached, the Court's analysis would remain

28  unchanged.

1    the other factors that go into the balance." <u>Barker</u>, 407 U.S. at 530; <u>see United States v.</u>

2    <u>Shell</u>, 974 F.2d 1035, 1036 (9th Cir. 1992).  In <u>Doggett</u>, the Supreme Court observed that

3    lower courts had generally found post-accusation delay presumptively prejudicial "as it

4    approaches one year."  <u>See</u> <u>Doggett</u>, 505 U.S. at 652 n.1.[12]

5          As discussed above, 585 days elapsed between the time petitioner was held to answer,

6    i.e., the attachment of petitioner's speedy trial rights, and the time petitioner's trial

7    commenced.  The primary cause for such delay, however, was petitioner's mental

8    competency proceedings.  The period during which a defendant is not competent is not

9    counted in the Court's assessment of whether the trial occurred in a timely fashion,  because

10   a state cannot, consistent with due process, hold a trial for a mentally incompetent defendant.

11   <u>See</u> <u>United States ex rel. Little v. Twomey</u>, 477 F.2d 767, 770 (7th Cir. 1973); cf. 18 U.S.C.

12   § 3161(h)(1)(A) (holding delays for mental competency evaluations are excluded from

13   federal Speedy Trial Act time computation); <u>see also</u> <u>United States v. Miranda</u>, 986 F.2d

14   1283, 1285 (9th Cir. 1993) (finding "district court did not violate the Speedy Trial Act by

15   excluding the time consumed during [defendant's] competency examination process"); <u>In re</u>

16   <u>Davis</u>, 8 Cal. 3d 798, 809 (1973) (holding commitment for determination of competency

17   under California Penal Code § 1368 does not deprive defendant of speedy trial rights).  Here,

18   petitioner's periods of mental incompetency, as well as the periods during which his

19   competency was in question, paused the speedy trial clock.  Accordingly, the following

20   periods will be excluded from the speedy trial calculation:

21       – 251 days: the period from September 15, 1998 (when the court suspended
     proceedings under Cal. Penal Code §§ 1367 and 1368) to May 24, 1999 (when
22   the court found petitioner competent and reinstated criminal proceedings).  (Ex.
     57.)

23

24       – 80 days: the period from November 15, 1999 (when defense counsel
     questioned petitioner's competence and moved for suspension of criminal
25   proceedings under Cal. Penal Code §§ 1367 and 1368 ) through February 3,
     2000 (when petitioner's competency trial concluded with a finding of
26   competence, and criminal proceedings were again reinstated).  (Ex. 1 at 46-51,

27       [12]The Ninth Circuit has described a six-month delay as a "borderline case," noting
     "there is a general consensus among the courts of appeals that eight months constitutes the
28   threshold minimum."  <u>United States v. Gregory</u>, 322 F.3d 1157, 1162 n.3 (9th Cir. 2003).

1      101.)

2          Additionally, the period from October 19, 1999 to November 15, 1999, comprising 27

3      days, will be excluded, because, as noted in the timeline, petitioner waived that time to allow

4      for receipt of doctors' reports under Penal Code § 1027(a). (Id. at 38-39.)

5          The above-referenced three periods total 358 days, which, when excluded from the

6      time elapsing between the date petitioner was held to answer and the commencement of trial,

7      leaves a cognizable delay of only 227 days, or approximately 7.5 months, from the time

8      petitioner's speedy trial rights attached.  Under Doggett, a delay of this length likely does not

9      suffice to require inquiry into the other Barker factors.[13]  Even if the delay is considered

10     presumptively prejudicial, however, the other Barker factors, as discussed below, weigh

11     against a finding of a speedy trial violation.

12          With respect to the second Barker factor, the reason for the delay, any deliberate

13     delay by the government "'to hamper the defense'" will "weigh[] heavily against the

14     prosecution," Vermont v. Brillon, 129 S.Ct. 1283, 1290 (2009) (quoting Barker, 407 U.S. at

15     531); "[a] more neutral reason such as negligence or overcrowded courts," is "weighed less

16     heavily, but nevertheless should be considered since the ultimate responsibility for such

17     circumstances must rest with the government rather than the defendant," Barker, 407 U.S. at

18     531.  "On the other hand, delay attributable to the defendant's own acts or to tactical

19     decisions by defense counsel will not bolster defendant's speedy trial argument."  McNeely

20     v. Blanas, 336 F.3d 822, 827 (9th Cir. 2003) (citing United States v. Goeltz, 513 F.2d 193,

21     197 (10th Cir. 1975)).  "[T]he prosecution bears the burden of explaining pretrial delays."

22     McNeely, 336 F.3d at 827.

23          Respondent attributes the delay in petitioner's case in large part to the competency

24

25          [13]The Court has found no authority specifying whether mental competency
26     proceedings should be considered in connection with the first Barker factor, i.e., calculation
       of the length of delay, or the second Barker factor, the reasons for the delay.   While the
27     Court has factored the competency proceedings into its calculation of the length of delay, if
       the Court were to reserve consideration of such proceedings until its assessment of the
28     reasons for the delay, the Court's analysis would remain unchanged, as any delay resulting
       from the competency proceedings is not attributable to the state.

United States District Court
For the Northern District of California

proceedings.  (Answer at 11-12.)  As discussed above, the Court agrees such proceedings constitute good cause for delay and has not attributed to the state the time encompassed thereby, or, indeed, included that time in its initial computation.  Respondent also  correctly points out that petitioner's own acts contributed to the delay when petitioner entered an eleventh hour plea of not guilty by reason of insanity, on October 19, 1999, the date on which trial was scheduled to start on the new information.  (Answer at 13.)  Although the prosecution, as noted, dismissed the charges on the date trial initially was scheduled to commence, and refiled those charges the following day, the dismissal was due to witness unavailability, and, accordingly, does not constitute a delay chargeable to the state.  See Barker, 407 U.S. at 531 (holding "a valid reason [for delay], such as a missing witness, should serve to justify appropriate delay").  Further, although it is not petitioner's burden to explain the reasons for delay, petitioner has not alleged any wrongdoing on the part of the state, either intentional or negligent, and a review of the record suggests none.

Having reviewed the record, the Court finds 7.5 months to be a reasonable amount of time for the prosecution to bring the case to trial, given the nature of the charges and the need for the prosecution to twice halt and subsequently recommence trial preparations following the suspensions necessitated by mental competency evaluations.

With respect to the third Barker factor, assertion of speedy trial rights, a defendant's repeated assertion of his right to a speedy trial is entitled to "strong evidentiary weight." Barker, 407 U.S. at 531-32.  Conversely, a defendant's failure to assert his speedy trial rights, although not dispositive, weighs against him.  See United States v. Sandoval, 990 F.2d 481, 484 (9th Cir. 1993).  The Court has assembled a separate timeline to evaluate this factor:

| September 4, 1996 | Criminal case docket notation: "time not waived by defendant." (Ex. 54.) |
| September 5, 1996 | Criminal case docket notation: "time waived for prelim 10/60 day rule."  (Id.) |
| November 1, 1996 | Criminal case docket notation: "time continues to be waived by defendant."  (Id.) |
| December 5, 1996 | Criminal case docket notation: "time waiver withdrawn by defendant."  (Id.) |

**United States District Court**
For the Northern District of California

| | |
|---|---|
| April 4, 1997 | Matter continued due to petitioner's refusal to come to court. (Ex. 55.) |
| April 7, 1997 | Matter continued due to petitioner's refusal to come to court. (Id.) |
| July 14, 1998 | Criminal case docket notation: "time not waived by defendant." (Id.) |
| July 23, 1998 | Petitioner moves for continuance of preliminary hearing and offers to waive time. (Ex. 8 at 19.) Motion is denied. (Id.)[14] Preliminary hearing begins. (Id.) |
| July 24, 1998 | Criminal case docket notation: "defendant refused to participate in this morning's proceedings by closing his eyes and not responding to the court's inquiries." (Ex. 54.) |
| July 27, 1999 | Criminal case docket notation: "time not waived by defendant." (Ex. 58.) |
| August 19, 1999 | Criminal case docket notation: "time not waived for trial by def." (Ex. 1 at 9.) |
| October 19, 1999 | Petitioner waives time until November 15, 1999 for receipt of doctors' reports under Cal. Penal Code § 1027(a). (Ex. 1 at 38-39; Ex. 13 at 62-77.) Petitioner addresses court directly stating, "I will hereby waive time [sic] Sixth Amendment right to a speedy trial . . . to November 15, 1999." (Id.) |
| October 28, 1999 | At hearing on a conditional examination of a witness, court asks if time waiver remains in effect. Petitioner states, "I am now withdrawing it on the record. I refuse to waive time, any more time. . . . I am demanding my Sixth Amendment right to a speedy trial." (Ex. 14 at 87.) |
| November 8, 1999 | Petitioner again states in court, "I have not stopped waiving time. I also withdraw my waiver. . . . [T]he time waiver is no longer valid." (Ex. 15 at 112.) |
| November 15, 1999 | Upon motion by defense counsel under Cal. Penal Code §§ 1367 and 1368, court again suspends criminal proceedings to assess petitioner's mental competence. (Ex. 1 at 46, Ex. 16 at 125-26.) Petitioner states he wishes to withdraw his plea of not guilty by |

---

[14]A review of the transcript shows petitioner informed the court he was not prepared to proceed with the preliminary hearing because there was a search of his cell the previous evening, resulting in his separation from his legal materials. (Ex. 8 at 3-9.) The judge presiding over the preliminary hearing denied petitioner's request for a continuance, after having called into court a sergeant from the Sheriff's Department who reported that no legal documents were taken from petitioner; the sergeant brought to court a bag of items that had been taken from petitioner's cell and consisted primarily of such trash as newspapers, styrofoam cups, comic strips, and toilet paper that had been removed from petitioner's cell because deputies at the jail were concerned the excess of materials created a fire hazard. (Id. at 10-18.)

reason of insanity.  (Ex. 1 at 44, Ex. 16 at 124.)  Petitioner also moves to dismiss the case, stating, "[y]ou have violated my Constitutional right to a speedy trial."  (Ex. 16 at 122.)  Court denies the motion.  (Id.)

The above- described record reflects varying positions taken by petitioner with respect to a speedy trial.   While petitioner did at times make a record that he was asserting his speedy trial rights and did at times refuse to waive time, at other points he agreed to waive time, and even requested at least one continuance.  Moreover, even repeated assertions of a petitioner's speedy trial rights "must be viewed in light of [the petitioner's] other conduct." United States v. Loud Hawk, 474 U.S. 302, 314 (1986).  A petitioner does not establish he appropriately asserted his speedy trial rights where, at the time he was making a record on this right in the trial court, he simultaneously was filing motions that contributed to the delay of his trial.  See id. at 314-15 (finding defendants' repeated assertions of their speedy trial rights was contradicted by their filing frivolous interlocutory petitions in court of appeals, which consumed six months of time, as well as their filing repeated and unsuccessful motions in trial court).

Here, the record shows petitioner made no fewer than seven Faretta motions and no fewer than six Marsden motions,[15] all of which were denied.  (Ex. 1 at 38, 83, 91, 161, 226; Ex. 11 at 4-6; Ex. 17 at 204-13; Ex. 19 at 250-55; Ex. 26 at 4; Ex. 29 at 7; Ex. 30 at 101; Ex. 35 at 232-70.)  Petitioner also filed miscellaneous frivolous motions and sent miscellaneous documents to the trial court for its consideration.[16]  In addition, petitioner filed no fewer than four habeas corpus petitions in the state court during the pendency of his criminal proceedings, challenging the legality of those proceedings.  (Ex. 1 at 71-74, 76; Ex. 14 at 87.)

---

[15]People v. Marsden, 2 Cal. 3d 118 (1970), concerns a criminal defendant's request to substitute counsel and requires the trial court to afford such defendant an opportunity to specify the reasons for his request and, in most instances, also requires the court to hold a hearing thereon.

[16]These motions included a motion to recuse Judge Forcum, a motion for a new competency trial, and a motion for a "Stankewitz hearing."  (Ex. 1 at 91; Ex. 26 at 4.)  The state court also noted the "bundle of documents" submitted by petitioner over the course of the proceedings, including inmate grievance forms, newspaper articles, and a letter.  (Ex. 1 at 76.)

United States District Court
For the Northern District of California

1  Finally, petitioner engaged in a variety of delaying tactics, including his refusing to appear in

2  court and refusing to speak, as well as his entering a not guilty by reason of insanity plea on

3  the eve of trial in October 1999, withdrawing the plea shortly thereafter, and re-entering the

4  plea after trial commenced in February 2000. (Ex. 1 at 38-39, 44, 212; Ex. 13 at 62-77; Exs.

5  54-55.) Indeed, the trial court regularly found petitioner's misconduct was obstructing

6  proceedings and was intended to cause delay. (See e.g., Ex. 8 at 170; Ex. 15 at 113.)

7      In short, to the extent petitioner asserted his right to a speedy trial, such assertions are

8  countered by his repeated delay of the proceedings, and in particular, by his refusing to

9  accept appointed counsel, making frivolous motions, and engaging in disruptive behavior.

10     With respect to the fourth Barker factor, prejudice to the defendant, the Supreme

11  Court has acknowledged the following types of prejudice: "oppressive pretrial incarceration,

12  anxiety and concern of the accused, and the possibility that the [accused's] defense will be

13  impaired by dimming memories and loss of exculpatory evidence," the last being "the most

14  serious." Doggett, 505 U.S. at 654 (internal quotation and citation omitted). The petitioner

15  bears the burden of demonstrating actual prejudice under the fourth Barker factor where, as

16  here, the record reflects the government's exercise of "reasonable diligence" in pursuing the

17  petitioner and bringing him to trial. See United States v. Mendoza, 530 F.3d 758, 762-764

18  (9th Cir. 2008). In the instant case, petitioner does not point to any impairment to his defense

19  resulting from the alleged delay in his trial. Rather, petitioner appears to base his speedy trial

20  claim solely on the fact that a delay occurred. Nor does the record before the Court

21  otherwise support a finding of prejudice. Most importantly, it does not appear from the

22  record that any witness became unavailable or that any potential evidence was lost because of

23  the delay.

24     In sum, given that the delay of petitioner's trial did not "approach" a year, that most of

25  the delay was not attributable to the prosecution, that petitioner engaged in dilatory conduct,

26  and that petitioner has failed to demonstrate prejudice, the Court finds petitioner's right to a

27  speedy trial under the Sixth Amendment was not violated.

28     Lastly, to the extent petitioner may be asserting a claim based on pre-indictment delay,

21

i.e., delay based on the state's delay in bringing charges against petitioner, any such claim likewise fails. Although the timing of the state's or government's filing of initial charges is subject to the general requirements of due process, <u>Prantil v. California</u>, 843 F.2d 314, 318 (9th Cir. 1988); <u>Arnold v. McCarthy</u>, 566 F.2d 1377, 1381-82 (9th Cir. 1978), such delay will not support a habeas claim unless it violates "fundamental conceptions of justice which lie at the base of our civil and political institutions," <u>United States v. Moran</u>, 759 F.2d 777, 782 (9th Cir. 1985); <u>Arnold</u>, 566 F.2d at 1381.

The Ninth Circuit applies a two-step test for determining whether pre-indictment delay violates due process. First, the petitioner must demonstrate the delay actually prejudiced his ability to defend himself. <u>United States v. Bracy</u>, 67 F.3d 1421, 1427 (9th Cir. 1995); <u>Prantil</u>, 843 F.2d at 318. Proof of prejudice is a "heavy burden that is rarely met," and it must be definite and not speculative. <u>Unites States v. Corona-Verbera</u>, 509 F.3d 1105, 1112 (9th Cir. 2007) (internal quotation and citation omitted). A defendant cannot rely solely on the mere "passage of time" to show prejudice. <u>See</u> <u>King</u>, 483 F.3d 969, 977 (9th Cir. 2007) (citing <u>United States v. MacDonald</u>, 456 U.S. 1, 8 (1982)); <u>see, e.g.</u>, <u>Corona-Verbera</u>, 509 F.3d at 1110, 1113 (finding no prejudice from delay of close to five years between events giving rise to charges and filing of federal indictment, where defendant failed to demonstrate "substantial prejudice").

Where actual prejudice is not established, the reasons for the delay need not be considered. <u>See</u> <u>Bracy</u>, 67 F.3d at 1427. If the petitioner demonstrates actual prejudice, the court must weigh the length of the delay against the reason for it. <u>Id.</u>; <u>United States v.</u> allege he suffered any prejudice from the delay. Consequently, petitioner fails to establish a due process violation for the period preceding the date he was held to answer.

Accordingly, petitioner is not entitled to habeas relief on this claim.

3.   <u>Improper Venue</u>

Petitioner claims San Mateo County was not a proper venue for his trial because he was in San Diego County at the time he made the calls and sent the letters to the victim. (Amended Pet. at 8.) Respondent argues venue was proper under the California Penal Code,

United States District Court
For the Northern District of California

which provides for jurisdiction in any county in which the "acts or effects [ ] constituting or requisite to the consummation of the offense occur."  Cal. Pen. Code § 781 ("When a public offense is committed in part in one jurisdictional territory and in part in another, . . . the jurisdiction of such offense is in any competent court within either jurisdictional territory.")

The Vicinage Clause of the Sixth Amendment guarantees an accused "the right to a . . . jury of the . . . State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."  U.S. Const. amend. VI.  In Stevenson v. Lewis, 384 F.3d 1069 (9th Cir. 2004), the Ninth Circuit affirmed the district court's decision to deny habeas relief on Vicinage Clause grounds where the petitioner therein alleged he was tried in a county different from the county in which the crime occurred; the Ninth Circuit reasoned that the United States Supreme Court had not decided whether the Vicinage Clause applies to the states through the Fourteenth Amendment.  Id. at 1071-72.  As discussed above, a district court may not grant habeas relief unless the state court decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  See 28 U.S.C. § 2254.  Consequently, in the absence of Supreme Court precedent holding federal constitutional vicinage rights extend to the states, petitioner cannot make the requisite showing for habeas relief.  See Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006).

Furthermore, as noted above, a habeas petitioner is not entitled to relief unless the asserted error "had substantial and injurious effect on the verdict."  Penry, 532 U.S. at 796.  Even assuming, arguendo, petitioner's Vicinage Clause rights were violated, petitioner has not shown how the state court's holding petitioner's trial in San Mateo County as opposed to San Diego County had a substantial and injurious effect on the jury's verdict.

Accordingly, petitioner is not entitled to habeas relief on this claim.

4.    Sentencing Error

Petitioner claims his sentence was impermissibly enhanced based on prior strike convictions that were not found to be true by a jury.  Specifically, on June 8, 2000, the trial court sentenced petitioner to 25 years to life in prison on Count 1 for stalking and enhanced

23

United States District Court
For the Northern District of California

1  the sentence by one year because of a prior prison term, pursuant to Penal Code § 667.5(b).

2  (Ex. 1 at 660-63.)

3        In <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000), the Supreme Court held any

4  fact that increases a criminal sentence beyond the statutory maximum must be decided by the

5  jury and proved beyond a reasonable doubt.  In <u>Apprendi</u>, however, the Supreme Court

6  expressly provided an exception for "the fact of a prior conviction."  <u>Id.</u>  Moreover, even

7  without the exception, petitioner's claim lacks merit.  Contrary to petitioner's contentions,

8  the record shows petitioner's prior strike convictions were pled in the information and found

9  true by a jury.  (Ex. 1 at 169-70, 239.)

10        Accordingly, petitioner is not entitled to habeas relief on this claim.

11  C.     <u>Appealability</u>

12        The federal rules governing habeas cases brought by state prisoners require a district

13  court that issues an order denying a habeas petition to either grant or deny therein a

14  certificate of appealability.  <u>See</u> Rules Governing § 2254 Cases, Rule 11(a).

15        A petitioner may not appeal a final order issued in a federal habeas corpus proceeding,

16  without first obtaining a certificate of appealability.  <u>See</u> 28 U.S.C. § 2253(c); Fed. R. App.

17  P. 22(b).  A judge may grant a certificate of appealability "only if the applicant has made a

18  substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

19  certificate must indicate which issues satisfy this standard, <u>id.</u> § 2253(c)(3).  "Where a

20  district court has rejected the constitutional claims on the merits, the showing required to

21  satisfy

22  § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would

23  find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v.</u>

24  <u>McDaniel</u>, 529 U.S. 473, 484 (2000).

25        Here, petitioner has not made such a showing and, accordingly, a certificate of

26  appealability will be denied.

27  //

28  //

24

**CONCLUSION**

For the reasons stated above, the Court orders as follows:

1.  The petition for a writ of habeas corpus is hereby DENIED.

2.  A certificate of appealability is hereby DENIED.

3.  The Clerk is directed to substitute KVSP Warden Kelly Harrington for respondent Arnold Schwarzenegger in this action.

The Clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

DATED: July 25, 2011

MAXINE M. CHESNEY
United States District Judge